UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DANIEL A. AYRES, | ) | Case No. 4:13CV600 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| vs. | ) | |
| | ) | [Resolving Doc. 19] |
| WEATHERFORD U.S., LP, | ) | |
| | ) | MEMORANDUM OPINION AND |
| Defendant. | ) | ORDER |

This matter is before the Court upon a motion for summary judgment (Doc. 19) filed by Defendant Weatherford U.S., LP "Weatherford." For the reasons stated herein, Defendant's motion for summary judgment is **GRANTED**.

**I.  FACTS**

The basic facts relative to the location, nature, and duration of Plaintiff's employment by Defendant are undisputed. In April of 2012, Plaintiff, Daniel A. Ayres, learned through a friend, that Defendant, "one of the largest drilling and mining operators in the world," was hiring for its fracing operations in North Dakota. Defendant, Weatherford, is a Louisiana limited partnership and one of the largest global providers of oil and natural gas well drilling equipment and services. (Decl. of Crabb at ¶ 2). Weatherford has fracing operations in multiple states, including Texas and North Dakota. Ayres, who lives in Poland, Ohio, began his employment with Weatherford in April 2012, when he traveled at Defendant's expense to Denver, Colorado for one week of training. After completing Weatherford's entry level driver training in Denver,

Ayres worked in Texarkana, Texas briefly before he was transferred to Williston, North Dakota in early July 2012.

Ayres's worksite was Williston from July until he was terminated on October 19, 2012. Ayres's work schedule was intended to be three weeks on at the work site, two weeks off. (Ayres Deposition, 45-47.) Weatherford paid for Ayres to fly back to Ohio, and paid him full time for all five weeks, both at the work site and at home. Ayres admits that he never worked for Weatherford in Ohio, that his supervisors were not based in Ohio, and that Weatherford did not control where he lived or spent his two weeks off. When Ayres arrived in Williston, he initially worked six straight weeks, instead of the intended three on two off schedule. After this six week stretch, Ayres was sent home to Ohio on paid leave. Ayres remained in Ohio, on paid leave, until he was laid off in October.

Weatherford states that Ayres was let go as part of a general reduction in force in Williston. According to Weatherford, in 2012 fracing operations in Williston were in beginning stages, there as a significant downturn in work in late summer/early fall 2012 because several contracts fell apart, while others were pushed back. When Ayres was moved to Williston, apparently due to the downturn in contact work, instead of primarily operating DOT regulated vehicles, his time was spent training, driving equipment, working on equipment, and performing security services. (Ayres Deposition, 67-69.) The Williston operation was instructed to cut costs. Ayres one of sixteen individuals terminated at the Williston site, the group included fourteen individuals who, like Ayres, were identified as equipment operators, as well as one listed as a driver. The equipment operators let go from the Williston site are classed I, II, and III – Ayres is listed as an Equipment Operator II – he is one of five Equipment Operator II employees of the fourteen Equipment Operators who were terminated from the Williston site. Ayres concedes that

2

he was aware others were let go when he was. (Ayres Deposition, 111.) Weatherford states that the reduction in force was carried out by the same district manager who hired Ayres, Terry Crabb, who explained that he asked each supervisor to identify essential equipment operators for a reduced force, and Ayers was not identified as essential. (Crabb Depostion, 34 and 40.) Crabb stated during his deposition that he asked human resources whether another work site was available for Ayres. No offer appears to have been forthcoming as a result of this inquiry.

According to Ayres's deposition the training he received in Denver included instruction on his duty to verify that all assignments given him are within his qualifications as a driver and that if the assignment is outside his qualifications he could refuse to perform it without retaliation. (Ayres Deposition, 62, Exhibit 9.) Ayres was also aware that Weatherford has an anonymous hotline for the reporting of workplace issues and a company policy prohibiting retaliation for reporting. (Ayres Deposition, 61-62.) Ayres himself first reported a workplace issue to his supervisor in Texarkana, according to his deposition he was satisfied with how his report was handled, and the incident is not part of this suit. (Ayres Deposition, 62-65.)

While in Williston Ayres was also involved in the complaints of another employee, Jeff Pittman, who complained that Terry Crabb, the district manager, was ignoring him, the conditions of the man camps[1] were poor, and that drivers were being asked to carry loads in violation of DOT regulations. (Ayres Depostion, 76-80, 93-95.) Ayres involvement appears to have been as a willing participant in the Human Resources investigation of the complaints. Jeff Pittman, the employee who made the complaints that resulted in the Human Resources investigation in Williston, was not let go as part of the reduction in force, he was transferred to Vernal, Utah, per his request. (Ayres Deposition, 124-125.) Ayres states that although Pittman

---

[1] Temporary quarters maintained by Weatherford for employees whose work location was not near enough to commute. Much of Weatherford's workforce lived in different states from their assigned work sites, and traveled between locations at Weatherford's expense, on a similar schedule to Ayres.

3

was transferred as he requested, he later chose to end his employment with Weatherford for another offer.

Ayres alleges that after the Pittman complaints, he raised multiple issues with his supervisors and with the Regional Human Resources Manager, James Nicholson. According to Ayres he expressed concern that drivers were being asked to carry loads in violation of DOT regulations, he himself had been asked to carry loads outside his qualifications, individuals were operating company vehicles while drinking, and that his time sheets were altered to remove twenty-seven hours of overtime he actually worked. Ayres concedes that the twenty-seven hours were restored and he was paid in full for the time. (Ayres Deposition, 129, 131.) Weatherford notes that there are no entries in Ayres's driving log concerning the alleged violation of DOT regulations, Ayres states that he said he was not certified to carry the loads and another driver was found. (Ayres Deposition, 93-95.)

Ayres states that he informed his supervisor and Crabb about the load violations, informed Crabb about the timesheet violations (Crabb was responsible for the alteration, which were corrected after a Human Resources review). Ayres further states that when he was unable to reach local human resources representatives, he contacted the regional head of human resources, James Nicholson, and informed him of the DOT violations, drinking, time sheet altering, and of statements made by Terry Crabb, that anyone who complained to HR would be fired. (Ayres Deposition, 105.) Nicholson recalls speaking with Ayres via telephone but does not recall all of the specifics of the conversation, apart from discussing a Weatherford shuttle to the airport. According to Nicholson, Ayres and a supervisor were on the same shuttle, separate from many of Ayers's colleagues, because there was not enough room on a single shuttle. (Nicholson Deposition, 31-33.) Ayres cites this trip to the airport as evidence that he had been singled out

4

for retaliation and deliberately separated from his colleagues. When other members of his team were called back to Williston on September 5, 2012, Ayres was not recalled.

On September 20, 2012, he emailed Nicholson, and copied several HR personnel, stating he believed he was being retaliated against in violation of company policy, he listed the violations of company policy he believed had occurred. Nicholson responded indicating that HR was investigating the work situation in North Dakota, but that the company was also "facing some realignment of our business in the Dakotas due to our consumer base." (Ayres Affidavit, Exhibit Q, p. 11.) Ayres emailed Nicholson again on October 5, 2012 asking to be reinstated. On October 22, 2012 Nicholson contacted Ayers to inform him that his last day of employment due to a reduction in force was October 19, 2012. Ayres appears to have applied for and received unemployment insurance benefits from Job Services North Dakota. (Ayres Affidavit, Exhibit N.)

Ayres filed this action asserting one count in violation of R.C. 4113.52, the "Ohio Whistleblower Statute" alleging his discharge was retaliation for reporting his supervisors, and a second count for violations of 29 USC 201, *et seq.*, the Fair Labor Standards Act, alleging he was discharged for complaining that he was not properly paid overtime.

## II.    LEGAL STANDARD

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Estate of Smithers v. City of Flint*, 602 F.3d 758, 761 (6th Cir. 2010). A fact must be essential to the outcome of a lawsuit to be 'material.' *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). Summary judgment must be entered when a party fails to make a "showing sufficient to establish…an element essential to that party's case." *Celotex Corp. v. Catrett*, 477

U.S. 317, 322-23. "Mere conclusory and unsupported allegations, rooted in speculation, do not meet [the] burden." *Bell v. Ohio State Univ.*, 351 F.3d 240, 253 (6th Cir. 2003).

Summary judgment creates a burden-shifting framework. See *Anderson*, 477 U.S. 250. The moving party has the initial burden of showing there is no genuine issue of material fact. *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 934 (6th Cir. 2000). Specifically,

> "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

Fed.R.Civ.P. 56(c)(1). The burden then shifts to the nonmoving party to prove that there is an issue of material fact that can be tried. *Plant,* 212 F.3d at 934. If this burden is not met, the moving party is then entitled to a judgment as a matter of law. *Bell*, 351 F.3d at 253. In evaluating a motion for summary judgment, the Court must construe the evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The non-moving party may not simply rely on its pleadings; rather it must "produce evidence that results in a conflict of material fact to be resolved by a jury." *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir.1996).

6

**III.   LEGAL ANALYSIS**

  **A. OHIO WHISTLEBLOWER**

The OWPA protects Ohio employees who report improper activity or otherwise engage in protected activities from adverse action. See ORC § 4113.52. Section 4113.52 (A)(1)(a) applies to the employees of private employers in Ohio:

> (A)(1)(a) If an employee becomes aware in the course of the employee's employment of a violation of any state or federal statute or any ordinance or regulation of a political subdivision that the employee's employer has authority to correct, and the employee reasonably believes that the violation is a criminal offense that is likely to cause an imminent risk of physical harm to persons or a hazard to public health or safety, a felony, or an improper solicitation for a contribution, the employee orally shall notify the employee's supervisor or other responsible officer of the employee's employer of the violation and subsequently shall file with that supervisor or officer a written report that provides sufficient detail to identify and describe the violation. If the employer does not correct the violation or make a reasonable and good faith effort to correct the violation within twenty-four hours after the oral notification or the receipt of the report, whichever is earlier, the employee may file a written report that provides sufficient detail to identify and describe the violation with the prosecuting authority of the county or municipal corporation where the violation occurred, with a peace officer, with the inspector general if the violation is within the inspector general's jurisdiction, or with any other appropriate public official or agency that has regulatory authority over the employer and the industry, trade, or business in which the employer is engaged.

To establish a prima facie case under the OWPA, Plaintiff must establish that: (1) he engaged in activity that would bring him within the protection of the OWPA; (2) he was subject to an adverse employment action; and (3) there was a causal link between the protected activity and the adverse employment action. *Wood v. Dorcas*, 142 Ohio App.3d 783, 791 (6th Dist. 2001). An employee is brought within the protection of the OWPA, if the employee: (1) reasonably believes that a violation of statute, ordinance, or regulation that the employee's employer has authority to correct; (2) reasonably believes that violation is a criminal offense; (3) reasonably believes that the violation is likely to cause an imminent risk of physical harm, a hazard to public health or safety, or a felony; (4) orally notifies the employee's supervisor or a responsible officer

7

of the violation; and (5) files a written report with the same supervisor or other responsible officer that provides sufficient detail to identify and describe the violation. O.R.C. § 4113.52(A)(1)(a).  The OWPA, by its own terms, protects employees and governs the actions of employers that take place in Ohio.

The right of the several States to self-rule is enshrined in the Bill of Rights: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Constitution, Amendment X. State sovereignty is a long settled principle:

> A state has the same undeniable and unlimited jurisdiction over all persons and things within its territorial limits, as any foreign nation; when that jurisdiction is not surrendered or restrained by the constitution of the United States.
>
> It is not only the right, but the bounden and solemn duty of a state, to advance the safety, happiness and prosperity of its people, and to provide for its general welfare, by any and every act of legislation which it may deem to be conducive to these ends, where the power over the particular subject, or the manner of its exercise, are not surrendered, or restrained by the constitution of the United States.
>
> All those powers which relate to merely municipal legislation, or which may more properly be called internal police, are not surrendered or restrained; and consequently, in relation to these the authority of a state is complete, unqualified and exclusive.

*Mayor, Aldermen & Commonalty of City of New York v. Miln*, 36 U.S. 102, 103, 9 L. Ed. 648 (1837). Applying an Ohio law to individuals and events that took place in North Dakota is a direct violation of North Dakota's "undeniable and unlimited jurisdiction over all persons and things within its territorial limits" that the Constitution guarantees. The violations of DOT regulations Ayres alleges would have taken place on North Dakota roads, if the individuals operating vehicles were intoxicated, it would be under the standard set in North Dakota, not Ohio. The fact that Weatherford also conducts business in Ohio, and that Ayres is an Ohio

resident, is irrelevant to the right and responsibility of North Dakota to regulate employer/employee relationships within its own borders. Ayres is clearly aware of this fact, as his North Dakota application for unemployment benefits indicates. Weatherford has demonstrated that there is no genuine dispute as to any material fact concerning the application of the OWPA to Ayres's employment in North Dakota. Weatherford's motion for summary judgment is GRANTED as to count one.

## B. FAIR LABOR STANDARDS ACT

The anti-retaliation provision of the FLSA makes it unlawful for an employer "to discharge or in any other manner discriminate against any employee because such employee has filed any compliant or instituted or caused to be instituted any proceeding under or related to" the FLSA. 29 U.S.C. § 215(a)(3). A plaintiff may prove unlawful retaliation either with direct evidence of such retaliation or with circumstantial evidence establishing a prima facie case under the burden-shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Taylor v. Geithner,* 703 F.3d 328, 336 (6th Cir.2013).

Ayres offers no direct evidence of retaliation; he must establish a prima facie case in reliance on circumstantial evidence. "To establish a prima facie case of retaliation, an employee must prove that (1) he or she engaged in a protected activity under the FLSA; (2) his or her exercise of this right was known by the employer; (3) thereafter, the employer took an employment action adverse to her; and (4) there was a causal connection between the protected activity and the adverse employment action." *Adair v. Charter Cnty. of Wayne,* 452 F.3d 482, 489 (6th Cir.2006). To the extent that Ayres succeeds in making out the elements of a prima facie case of retaliation, the burden of production shifts to Weatherford to articulate a legitimate, non-retaliatory reason for the terminations. *Dixon v. Gonzales,* 481 F.3d 324, 333 (6th Cir.

9

2007). Weatherford has explained Ayres's discharge as part of a reduction in force in Williston, Ayres was one of sixteen individuals let go, the majority of whom held the same Equipment Operator classification as Ayres. Because Weatherford has identified a legitimate, non-retaliatory reason, the burden shifts back to Ayres to show that the reason was a pretext for retaliation. *Id.*

To show pretext, the plaintiff must demonstrate that Weatherford's reasons (1) have no basis in fact, (2) did not actually motivate the discharge, or (3) were insufficient to motivate discharge. *Manzer v. Diamond Shamrock Chem. Co.,* 29 F.3d 1078, 1084 (6th Cir.1994). Weatherford states that it was in the early stages of North Dakota operations when Ayres began work. Ayres himself states that he began work three weeks early due to a miscommunication, and that his duties in Williston were not as expected, involving more security work than equipment operation. Weatherford states that Ayres was included in the reduction in force because he was non-essential, there is some indication that Weatherford considered placing Ayres elsewhere. Ayres acknowledges that he was one of several involved in the reduction in force, but contends that because many in his group were not included, and because Weatherford was actually in the process of hiring elsewhere, the reduction in force is pretextual.

Even if this Court were to assume that Weatherford made an inefficient business decision by reducing its North Dakota force rather than relocating employees to Vernal, Utah where there was need, inefficiency is not pretext. *See Gatch v. Milacron,* 111 Fed. Appx. 785, 791 (6th Cir.2004) ("even if the RIF was not entirely necessary from a business standpoint, it unquestionably occurred, resulting in the elimination of 38 jobs.... This evidence simply does not permit a finding that age discrimination rather than business judgment motivated the RIF"). The fact that Weatherford was hiring *somewhere* does not mean the company is required to retain, or

10

rehire, employees elsewhere. *See Almond v. ABB Indus. Sys., Inc.,* 56 Fed. Appx. 672, 678 (2003) (affirming summary judgment for defendant employer in ADEA suit, where employer hired new workers after a reduction in force; holding that "an employer has no duty to recall laid-off workers when a new position opens up").

Plaintiff acknowledges that at least six of his co-workers were also laid off in late 2012 due to the reduction in force. (Ayres Deposition, 111). He also admits that at least four of these six co-workers did not complain to Defendant prior to the reduction in force. (Ayres Deposition, 113). Ayres also acknowledges that the other employee, Pittman, he knew to have complained was not part of the reduction in force. The facts presented in this record indicate that sixteen Williston employees were involved in the reduction in force, several of them held the same position as Ayres, a majority of them held similar positions, there were employees involved in the reduction in force who did not engage in protected activity, and there was at least one employee who did engage in protected activity, but was not involved in the reduction in force. The FLSA protected complaint involving Ayres's overtime was investigated, and he was paid for the full 27 hours, Ayres has made no showing that there are additional hours owed, or any other basis for his FLSA claim. The material in this record does not support a causal connection between his complaints concerning overtime and his discharge as part of a general reduction in force. Accordingly, Defendant Weatherford's motion for summary judgment is GRANTED as to count two.

## IV. CONCLUSION

For the reasons discussed herein, the Court GRANTS Defendant's motion for summary judgment (Doc. 19). Judgment is hereby entered in favor of Defendant. The complaint is DISMISSED in its entirety.

IT IS SO ORDERED.

*John R. Adams*
JUDGE JOHN R. ADAMS
UNITED STATES DISTRICT COURT

**DATED**: SEPTEMBER 30, 2015